Brian S. King, #4610
Brent J. Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CHRISTOPHER P., individually and on behalf of B. P. a minor,<br><br>        Plaintiffs,<br><br>vs.<br><br>BLUECROSS BLUESHIELD of ILLINOIS, and the BOEING COMPANY CONSOLIDATED HEALTH and WELFARE BENEFIT PLAN,<br><br>        Defendants. | COMPLAINT<br><br>Case Number 2:20-cv-00168 HCN |

Plaintiff Christopher P. ("Christopher"), individually and on behalf of B. P. ("B.") a minor, through his undersigned counsel, complains and alleges against Defendants BlueCross BlueShield of Illinois ("BCBSIL") and the Boeing Company Consolidated Health and Welfare Benefit Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Christopher and B. are natural persons residing in St. Louis County, Missouri. Christopher is B.'s father.

1

2. BCBSIL is an independent licensee of the nationwide Blue Cross and Blue Shield association of providers, and was the claims administrator for the Plan during the treatment at issue in this case.

3. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Christopher was a participant in the Plan and B. was a beneficiary of the Plan at all relevant times. Christopher and B. continue to be participants and beneficiaries of the Plan.

4. B. received medical care and treatment at Change Academy Lake of the Ozarks ("CALO") from April 11, 2018, to July 18, 2019. CALO is a residential treatment facility in Missouri which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. CALO specializes in treating individuals suffering from attachment disorders.

5. BCBSIL denied claims for payment of B.'s medical expenses in connection with his treatment at CALO. This lawsuit is brought to obtain the Court's order requiring the Plan to reimburse Christopher for the medical expenses he has incurred and paid for B.'s treatment.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, and because BCBSIL does business in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### B.'s Developmental History and Medical Background

9. B. was born in Guatemala. Little is known of his early history except that he was surrendered by his birth mother around the age of two and a half. He was then placed into foster care until he was adopted by Christopher around the time that he was three years old.

10. When Christopher came down to Guatemala City to finalize the adoption, B.'s foster family apologized for B.'s constant hitting, biting, and kicking. He was simply told that, "He came to us like that." B. continued this pattern of inappropriately responding to stressors with physical aggression throughout his life.

11. B. was aggressive with his adoptive older brother in particular. He would frequently alternate between being affectionate and being violent and destructive. B. threw frequent tantrums and had difficulty when even small boundaries were established, he often tried to pit his parents against each other.

12. Christopher began to feel uneasy about leaving B. alone with his brother. After an incident where B. punched his brother in the throat because he wanted to use the

3

computer. Christopher took B. to a therapist who diagnosed B.'s problems as stemming from attachment related issues.

13. B. was also physically aggressive while at school and would frequently bully his classmates. B. was watched closely by his teachers and was placed on an individualized education plan. B. struggled with keeping friends. He seemed able to make friends fairly easily, but his bullying behaviors tended to quickly drive them away. Christopher was contacted by parents of B.'s peers on more than one occasion to inform him of B.'s bullying behaviors, for instance, telling a girl on the bus every day for months that, "You're too stupid to go to this school."

14. B. continued therapy but his behavior continued to decline. H was suspended from school for two days after attacking another boy in the bathroom. Around the time that B. was in seventh grade, he was also discovered to be self-harming by cutting. After a particularly serious cutting incident, B. was taken to the emergency room and was then transferred to an inpatient treatment center.

15. B. was sent to a military academy for his eighth grade year, but the focus on discipline and authority, coupled with his newfound friendships with other troubled students, further aggravated B.'s defiant behaviors. B. began experimenting with drugs at this school and his parents also found condoms in his room.

16. B. was hospitalized after expressing a desire to kill himself. After he returned to school, he continued to make suicidal comments, assaulted a staff member, and then ran away from the school. B. waded through a river in the middle of winter and broke into an empty warehouse. B. eventually returned to school after being unable to cope with being cold and damp in the freezing winter weather.

17. B. was asked to leave the school and told that he would not be able to come back without a psychological evaluation. B. returned to his public school, but on his second day back he was suspended for two days for vaping in class. B.'s therapist stated that until B.'s attachment issues were resolved he would continue to act out like this. B.'s treatment team recommended that he be sent to CALO. B. was enrolled in a treatment program called New Vision while he waited for space to be available at CALO. While at New Vision, B. assaulted a staff member and had to be discharged prematurely.

## CALO

18. B. was admitted to CALO on April 11, 2018.

19. In a letter dated March 13, 2019, BCBSIL denied payment for B.'s treatment. The letter stated in part:

    > Per the medical necessity provision of your benefit plan, a medical necessity review has been completed. Based on the information provided, you do not meet MCG care guidelines Residential Acute Behavioral Health Level of Care (Child/Adolescent) Guidelines for the following reasons: You are stable. You do not want to hurt yourself or others. You are not aggressive. You do not need 24-hours [sic] care. From the information provided, you can be safely treated in a different setting such as Mental Health Intensive Outpatient. No medically necessary days were authorized.

20. On September 6, 2019, Christopher appealed the denial of payment for B.'s treatment. Christopher wrote that BCBSIL had not complied with its obligations under ERISA, which among things, required BCBSIL to provide a full and fair review of B.'s claims using an appropriately qualified reviewer and to disclose their name and qualifications.

21. Christopher took issue with BCBSIL's use of acute care guidelines to evaluate the medical necessity of the non-acute level of care that B. was receiving. He contended that it was inappropriate to require acute symptomology such as a danger to self or others as a prerequisite for care in both acute as well as non acute environments.

22. Christopher contended that the use of acute care guidelines to evaluate sub acute residential treatment care was contrary to generally accepted standards of medical practice. He asserted that proprietary guidelines did not take precedence over generally accepted standards of medical practice.

23. Christopher claimed that the Plan's denial likely violated MHPAEA. He wrote that MHPAEA required insurers to offer mental health coverage "at parity" with comparable medical or surgical benefits. He identified skilled nursing facilities as one of the intermediate level medical or surgical analogues to B.'s residential treatment and contended that BCBSIL did not impose treatment limitations such as requiring acute symptomology for treatment in a skilled nursing environment.

24. He cited numerous sources from the mental health field, including the American Academy of Child and Adolescent Psychiatry, which stated that residential treatment was a level of care below acute hospitalization, but above less intensive interventions such as outpatient treatment. He wrote that "[t]hese descriptions of RTCs[1] do not include requirements for patients to want to hurt themselves or others."

25. He also cited to a recent lawsuit *David Wit et al v United Behavioral Health* where an insurer's guidelines were found to deviate from generally accepted standards of care because they placed an overemphasis on crisis stabilization and were designed to recommend a lower level of care even when such treatment would be considered less effective. Christopher expressed concern that BCBSIL's guidelines were similarly flawed.

---

[1] Residential treatment centers

26. Christopher noted that although B. had attempted less intensive levels of care, these interventions had not proved sufficient to adequately treat B.'s complex mental health symptoms. He asserted that CALO was a specialized residential treatment facility focused on treating individuals such as B. who suffered from Reactive Attachment Disorder.

27. Christopher wrote that B. was admitted to CALO based on the recommendation of his treatment team after he was discharged from his previous placement at New Vision prematurely due to behavioral problems and high levels of physical aggression.

28. Christopher requested that BCBSIL provide him with "the necessary documents to conduct a parity analysis of our plan." He requested that because BCBSIL's denial was noncompliant with MHPAEA and widely recognized standards of medical practice, that B.'s treatment be evaluated using the Plan's definition of medical necessity.

29. Christopher included letters of medical necessity with the appeal. In a letter dated August 22, 2018, Sandra Macke-Piper MSC, PLPC and Jeffrey Taylor, MAC, LPC, wrote in part:

> Calo's residential treatment program is an attachment-based program designed to help children and families with severe and persistent Reactive Attachment Disorder. It is an intensive therapy aimed at improving the quality of life and health for children and their families. It is accredited by The Joint Commission, endorsed by the National Association of Therapeutic Schools and Programs, and approved by the Missouri Department of Social Services. It is a reputable and effective residential treatment program, one of a handful available, for treating this intractable disorder…
>
> [B. P.] was unresponsive to numerous other types of treatment for RAD[2] and, as such, it was necessary for him to receive intensive and long-term therapy; the kind which can only be found in a residential treatment program.

---

[2] Reactive Attachment Disorder

7

One of B.'s therapists, Wesley Bruce, M.A., LPC, wrote in a letter dated April 9, 2018, that B.'s behavior at New Vision, "placed himself and caregivers in immediate danger" Consequently, B. required immediate crisis transportation to a residential treatment program. The letter continued:

> Should these recommendations not be followed, it is extremely likely that [B.] will continue to place himself and others in unsafe situations and [this] will likely result in [B.] being hospitalized and/or experience legal issues resulting in his confinement.

30. Christopher argued that B.'s treatment at CALO had been transformative and had been successful at treating B.'s conditions when few other interventions had been effective. He pointed out that Reactive Attachment Disorder was a "serious and highly specialized diagnosis that requires a very specific type of therapeutic treatment."

31. Christopher requested that in the event that BCBSIL maintained the denial of payment for B.'s treatment that it provide him with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, the Plan's mental health and substance abuse criteria, the Plan's criteria for cognitive rehabilitation, inpatient rehabilitation, and hospice services, and any reports from physicians or other professionals concerning the claim. (collectively the "Plan Documents") He contended that he needed these materials to evaluate whether or not the Plan was compliant with MHPAEA.

32. In a letter dated September 19, 2019, BCBSIL upheld the denial of payment for B.'s treatment at CALO. The letter stated in part:

> Per the medical necessity provision of the member's benefit plan, a medical necessity review has been completed. Based on the information provided, the

8

>member did not meet MCG Care Guidelines Other Psychiatric Disorders, Child or Adolescent: Residential Care (B-902-RES) 20th Edition for the following reasons: The member was not a danger to himself. The member was not a danger to others. The member was not violent. The member was medically stable. The member did not require 24 hour nursing or medical care. The member did not require 24 hour psychiatric or behavioral care. From the information provided, the member could be safely treated in a different setting such as Mental Health Intensive Outpatient. No medically necessary days were authorized

33. The letter then quoted the summary plan description definitions for preadmission/preapproval and medical necessity. Notably, although the reviewer denied payment stating that B. did not meet acute care requirements such as posing a danger to self or others, the summary plan description definition of medical necessity as quoted by the reviewer contains no such requirements. Instead it states as follows:

    Medically Necessary Service or Supply

    A treatment, service or supply that meets the following criteria in accordance with the plan and as determined by the service representative. A treatment, service or supply is medically necessary if it is:

    Required to diagnose or treat the patient's illness, injury, or condition and the condition could not have been diagnosed or treated without it.

    Consistent with the symptom or diagnosis and the treatment of the condition.

    The most appropriate service or supply that is essential to the patient's needs.

    Appropriate as good medical practice.

    Professionally and broadly accepted as the usual, customary, and effective means of diagnosing or treating the illness, injury, or condition.

    Unable to be provided safely to the patient as an outpatient (for an inpatient service or supply).

    Not experimental or investigational as defined in this section.

    A treatment, service or supply may be medically necessary in part only. The fact the treatment service or supply is furnished, prescribed, recommended, or approved by a physician does not, by itself, make it medically necessary. Treatments, services or supplies provided for or in connection with an approved

clinical trial as described in the experimental or investigational definition do not need to meet the above criteria.

34. In addition, the summary plan description states on page 1: "Any representations contrary to the Plan or the Plan document are not binding."

35. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

36. The denial of benefits for B.'s treatment was a breach of contract and caused Christopher to incur medical expenses that should have been paid by the Plan in an amount totaling over $280,000.

37. In spite of Christopher's request, BCBSIL failed to provide Christopher with a copy of the Plan Documents, including the Plan's medical necessity criteria for mental health and substance use disorder treatment

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

38. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSIL, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

39. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

40. The denial letters produced by BCBSIL do little to elucidate whether BCBSIL conducted

a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. BCBSIL failed to substantively respond to the issues presented in the Plaintiffs' appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

41. In fact, BCBSIL's denial letters do not address the arguments raised by Christopher during the appeal process in any capacity.

42. BCBSIL and the agents of the Plan breached their fiduciary duties to B. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in B.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of B.'s claims.

43. The actions of BCBSIL and the Plan in failing to provide coverage for B.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

44. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

45. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

46. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant

treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

47. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

48. Specifically, the Plan's medical necessity criteria for intermediate level mental health treatment benefits are more stringent or restrictive than the medical necessity criteria the Plan applies to intermediate level medical or surgical benefits.

49. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for B.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does BCBSIL exclude or restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner BCBSIL excluded coverage of treatment for B. at CALO.

50. Specifically, in its review of B.'s claims, BCBSIL's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that B. received. BCBSIL readily acknowledged that it employed acute criteria to evaluate the claims in statements such as "you do not meet MCG care guidelines Residential Acute Behavioral Health Level of Care (Child/Adolescent) Guidelines."

51. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that B. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

52. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

53. When BCBSIL and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. BCBSIL and the Plan evaluated B.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

54. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBSIL, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

55. BCBSIL and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any capacity the Plaintiffs' allegations that BCBSIL and the Plan were not in compliance with MHPAEA.

56. The violations of MHPAEA by BCBSIL and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendants violate MHPAEA;

    (b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan and other BCBSIL insured and administered plans as a result of the Defendants' violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

57. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for B.'s medically necessary treatment at CALO under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 12th day of March 2020.

By    s/ Brian S. King
      Brian S. King
      Attorney for Plaintiffs

County of Plaintiffs' Residence:
St. Louis County, Missouri

15